1
2
3
4
5
6
7
8              **UNITED STATES DISTRICT COURT**

9            **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11   AMADO HARO and ROCHELLE ORTEGA, On Behalf of Themselves and 12   All Others Similarly Situated, | No.  1:21-cv-00239-KES-SKO |
| 13                Plaintiff, | **ORDER GRANTING UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT** |
| 14         v. | **ORDER GRANTING UNOPPOSED MOTION FOR ATTORNEY'S FEES AND** |
| 15   WALMART, INC., | **COSTS AND FOR APPROVAL OF SERVICE AWARD AND INDIVIDUAL** |
| 16                Defendant. | **SETTLEMENT** |
| 17 | (Docs. 143, 149) |
| 18 | |

19          Pending before the Court is an unopposed motion for final approval of a class action

20  settlement and unopposed motion for attorney's fees and costs and for approval of service awards

21  and individual settlements by Plaintiffs Amanda Haro and Rochelle Ortega.  (Docs. 143, 149).  For

22  the reasons explained below, the Court grants final approval of the proposed class action settlement

23  and grants in part the motion for attorney's fees and costs and for approval of service award and

24  individual settlement.[1]

25                    **I.        BACKGROUND**

26

27  _____

[1] The parties stipulated to the jurisdiction of the U.S. Magistrate Judge for purposes of handling the present motion; Judge Mueller granted the stipulation and submitted the motion for decision on January 10, 2024. (*See* Docs. 129–
28  30.)

1    The Court previously summarized Plaintiff's allegations in its March 18, 2024, order granting
2    Plaintiffs' motion for preliminary approval of a class action settlement and conditional class
3    certification, (Doc. 135), and will not repeat the factual background in this order.  Following the
4    grant of preliminary approval in this action, Plaintiff filed a Motion for Attorney Fees, Litigation
5    Costs, and Service Awards to the Named Plaintiffs (Doc. 143) on May 28, 2024.  Plaintiff filed a
6    Motion for Final Approval of Class Action Settlement (Doc. 149) on July 31, 2024.   In support of
7    the motions, Plaintiffs have submitted declarations from themselves, class counsel, and the
8    settlement administrator in this action.  (Docs. 149-2, 3, 4, 5).  Defendant has not opposed either
9    motion.  (*See* Docket).

10    Under the proposed settlement, Defendant will pay a total of $5,200,000 (the "Gross Settlement
11    Amount" or "GSA").  (Doc. 149 at 10).  Defendant will also pay the employer's share of the
12    applicable payroll taxes.  (*Id.*).  Assuming the parties' proposed allocations are awarded in full,
13    approximately $2,715,066.13[2] (the "Net Settlement Amount" or "NSA") will be available for
14    distribution to Class Members to be divided based on their dates of employment and weeks worked.
15    (*See* Doc. 149 at 10).

16                    **II.         FINAL CERTIFICATION OF SETTLEMENT CLASS**

17    The Court examined the class action factors in the order granting preliminary approval of
18    the settlement and found the factors warranted certification.  (Doc. 135 at 10–16).  The Court's
19    findings on these issues have not changed, and no objections to class certification were raised.
20    Accordingly, the Court will not repeat the analysis on these issues here.  *See, e.g., Harris v. Vector*
21    *Marketing*, No. C–08–5198 EMC, 2012 WL 381202 at *3, at *7 (N.D. Cal. Feb. 6, 2012) ("As a
22    preliminary matter, the court notes that it previously certified . . . a Rule 23(b)(3) class . . . . [Thus,
23    it] need not analyze whether the requirements for certification have been met and may focus instead
24    on whether the proposed settlement is fair, adequate, and reasonable."); *In re Apollo Group Inc.*
25    *Securities Litigation*, No. CV 04-2147-PHX-JAT, 2012 WL 1378677 at *4 (D. Ariz. Apr. 20, 2012)

26    _____

27    [2] The NSA is the GSA ($5,200,000) less the PAGA penalties payable to the to the California Labor and Workforce
       Development Agency ("LWDA") ($37,500); incentive awards ($20,000); costs to be paid a third-party administrator
28    for administering the settlement ($432,522); attorneys' fees ($1,733,160) (one-third of the GSA); and litigation
       expenses ($261,751.87).  (Docs. 143, 149).

("The Court has previously certified, pursuant to Rule 23[,] . . . and hereby reconfirms its order certifying a class").

The Court hereby confirms its prior order and certifies three types of class members: (1) the California Class Members, (2) the FLSA Class Members, and (3) the Dual Class Members, who are a member of both the California Class and the FLSA Class.[3]  (*See* Doc. 127-1 at 12–13).  In addition, for the reasons stated in the Court's previous order, Plaintiffs Amanda Haro and Rochelle Ortega are confirmed as class representatives, Don Foty of Hodges & Foty, LLP is confirmed as class counsel; and Rust Consulting, Inc. ("Rust"), is confirmed as the settlement administrator.

### III.        FINAL APPROVAL OF CLASS ACTION SETTLEMENT

Class actions require the district court's approval prior to settlement.  Fed. R. Civ. P 23(e). To approve a settlement, a district court must: (i) ensure notice is sent to all class members; (ii) hold a hearing and make a finding that the settlement is fair, reasonable, and adequate; (iii) confirm that the parties seeking approval file a statement identifying the settlement agreement; and (iv) be shown that class members were given an opportunity to object. Fed. R. Civ. P. 23(e)(1)–(5).  The parties filed the settlement agreement on December 15, 2023, (Doc. 127-1), and Class Members were given an opportunity to object on or before June 20, 2024.  (Doc. 135 at 25).  Neither Rust nor the Court received any objections, timely or otherwise, to the settlement.  (*See* Docket; Doc. 149 at 27).  The Court now turns to the adequacy of notice and its review of the settlement.

### A.        Notice

Adequate notice of the class settlement must be provided under Rule 23(e).  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1025 (9th Cir. 1998); *see also Silber v. Mabon*, 18 F.3d 1449, 1453-54 (9th Cir. 1994) (noting that the court need not ensure all class members receive actual notice, only that "best practicable notice" is given); *Winans v. Emeritus Corp.*, No. 4:13-cv-03962-HSG,

---

[3] In Plaintiffs' Motion for Class Certification under Rule 23 (Doc. 43), Plaintiffs define the class as "all hourly paid employees of Walmart who worked in a Walmart retail store in California at any time since April 10, 2020." Proposed subclasses include (1) the April 10 Class (all hourly Walmart employees who worked in a California Walmart retail store on April 10, 2020); (2) April 11 Class (all hourly Walmart employees who worked in a California Walmart retail store since April 11, 2020; (3) the Wage Statement Class (all hourly Walmart employees who worked in a California Walmart retail store at any time from April 10, 2020, to the present and received at least one wage statement from Walmart; and (4) the Final Paycheck Class (all hourly Walmart Employees who worked in a California Walmart retail store at any time from April 10, 2020, to the present and are no longer employed by Walmart). (Doc. 43 at 2).

2016 WL 107574, at *3 (N.D. Cal. Jan. 11, 2016) ("While Rule 23 requires that 'reasonable effort' be made to reach all class members, it does not require that each individual actually receive notice."). "Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'" *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (quoting *Mendoza v. Tucson Sch. Dist. No. 1*, 623 F.2d 1338, 1352 (9th Cir. 1980)). Any notice of the settlement sent to the class should alert class members of "the opportunity to opt-out and individually pursue any state law remedies that might provide a better opportunity for recovery." *Hanlon*, 150 F.3d at 1025.

The Court previously reviewed the notice provided in this case at the preliminary approval stage and found it to be satisfactory. (Doc. 135 at 21–22). Following the grant of preliminary approval, class counsel engaged Rust to provide the necessary notification services to administer the settlement, including "a) preparing, printing and mailing of the Notice of Class Action and Fair Labor Standards Act Settlement ('Notice') and Opt-In Form ('Opt-in Form'), (collectively known as the 'Class Notice'); b) receiving and reviewing Opt-in Forms; c) tracking of exclusions and objections; d) drafting and mailing Settlement Award checks; e) arrang[ing] for the creation and maintenance of a publicly available website; and f) for such other tasks as the Parties mutually agree or the Court orders Rust to perform." (Doc. 149-3 at 2-3).

To effectuate Defendant's notice requirement, Rust obtained the website www.HaroWalmartSettlement.com. (*Id.*). The website included the Class Notice, the Order and Settlement Agreement, additional information about the Settlement, and the option to submit an Opt-in Form. (Doc. 149-3 at 2). The website went live on June 3, 2024. (*Id.*).

On June 3, 2024, Rust, on behalf of Defendant, sent Class Notices to 75,657 Class Members via First Class Mail. (*Id.*). The notice advised Class Members they could submit a claim for, exclusion or objection, postmarked by August 2, 2024. (*Id.*). That day, Rust also sent Class Notices via email to 145,735 Class Members whose email addresses were contained in the Class List. These notices also advised Class Members they could submit a claim for, exclusion or objection, postmarked by August 2, 2024. (*Id.*). Rust sent 221,393 Class Notices to Class Members. (*Id.*).

The Class Notice notified recipients that to opt-out of the settlement, they must affirmatively

do so by submitting a timely and valid Request for Exclusion to the Settlement Administrator. (Doc. 149-1 at 38).  The Class Noticed provided that :

> The Request for Exclusion must: (i) set forth the Class Member's name, mailing address, telephone number, email address, and Walmart identification number (WIN) or last four digits of the Class Member's Social Security Number; (ii) be signed by the Class Member (if sent via a written request) and reference the Action by name, case number, or other information sufficient to unambiguously identify the Action; (iii) clearly state that the Class Member does not wish to be included in the California Class or FLSA Class; (iv) be returned to the Settlement Administrator; and (v) be received or postmarked on or before the deadline

*Id*.  With regard to objections, the notice provided that:

> If you do not request exclusion from the Settlement but believe the proposed Settlement is unfair or inadequate in any respect, you may object to the Settlement. To object to the Settlement ("Objection"), a Class Member must sign and file a written Objection to the Settlement by either (a) sending it to the Court with a postmark on or before the deadline of [], or (b) filing it with the Court on or before the deadline of []. In order for the Objection to be valid, the Objection must: (a) include the objector's full name, address, email address, and telephone number; (b) be signed by the Class Member; (c) reference the Action by name, case number, or other information sufficient to unambiguously identify the Action; (d) state all grounds for the Objection, including without limitation, demonstrating standing to object (i.e. membership in the Settlement Class); state whether the Class Member or their lawyer intends to appear at the Final Approval Hearing; and include any written material on which their objection is based or on which they intend to rely; (e) either be mailed to the Court with a postmark on or before the Response Deadline or filed with the Court on or before the Response Deadline; and (f) be sent to the Settlement Administrator with a postmark on or before the Response Deadline. The postmark or filing date of the Objection, whichever is earlier, will be deemed the exclusive means for determining that the Objection is timely. The Parties have the right to conduct reasonable discovery as to the basis of any Objection on an expedited basis.

(Doc. 149-1 at 38-39).

Of the notices sent, 8,535 Class Notices were returned as undeliverable.  (*Id.*).  Rust performed "address traces" on these 8,535 addresses, which involves using the Class Member's name, previous address, and Social Security number to locate a current address.  (*Id.*).  Rust re-mailed Class Notices to 7,056 of the Class Members who whose notices were returned as undeliverable.  (*Id.*).  Of the Class Notices re-sent after the address trace, 573 were returned as undeliverable.  In total, 2,052 Class Notices were undeliverable.  (*Id.*).  Rust received 4,567 Opt-in Forms via its website, and another 3,550 forms via first class mail.  (*Id.* at 3).  At the time of briefing, Rust had received 19 exclusions.  (*Id.*).

In light of the foregoing, the Court accepts the reports of the settlement administrator and finds that Defendant provided adequate notice, thereby satisfying Federal Rule of Civil Procedure 23(e)(1). *Silber*, 18 F.3d at 1453-54; *Winans*, 2016 WL 107574, at *3.

### B.   Final Fairness Determination

At the final approval stage, the primary inquiry is whether the proposed settlement "is fundamentally fair, adequate, and reasonable." Fed. R. Civ. P. 23(e)(2); *Lane v. Facebook, Inc.*, 696 F.3d 811, 818 (9th Cir. 2012); *Hanlon*, 150 F.3d at 1026. "It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness." *Hanlon*, 150 F.3d at 1026 (citing *Officers for Justice v. Civil Serv. Comm'n of S.F.*, 688 F.2d 615, 628 (9th Cir. 1982)); *see also Lane*, 696 F.3d at 818. Having already completed a preliminary examination of the agreement, the Court reviews it again, mindful that the law favors the compromise and settlement of class action suits. *See, e.g., In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008); *Churchill Vill.,* 361 F.3d at 576; *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992); *Officers for Justice*, 688 F.2d at 625. Ultimately, "the decision to approve or reject a settlement is committed to the sound discretion of the trial judge because [they are] exposed to the litigants and their strategies, positions, and proof." *Staton v. Boeing Co*, 327 F.3d 938, 953 (9th Cir. 2003) (quoting *Hanlon*, 150 F.3d at 1026).

In assessing the fairness of a class action settlement, courts balance the following factors:

> (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

*Churchill Vill.*, 361 F.3d at 575; *see also In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 944 (9th Cir. 2015); *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 964-67 (9th Cir. 2009). These settlement factors are non-exclusive, and each need not be discussed if they are irrelevant to a particular case. *Churchill Vill.,* 361 F.3d at 576 n.7.

Consideration of the *Churchill* factors alone is not sufficient to survive appellate review. *See Briseño v. Henderson*, 998 F.3d 1014, 1022-26 (9th Cir. 2021) (holding that the revised Rule

23(e) requires district courts "to go beyond our precedent" and mandates consideration of "the *Bluetooth* factors" to all class action settlements, regardless of whether settlement was achieved before or after class certification); *see also* Fed. R. Civ. P. 23(e)(2)(C)-(D).  Under the revised Rule 23(e), "district courts must apply the *Bluetooth* factors to scrutinize fee arrangements . . . to determine if collusion may have led to class members being shortchanged."  *Briseño*, 998 F.3d at 1026.  The so-called *Bluetooth* factors—also referred to as "subtle signs" of collusion—include: (i) "when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded;" (ii) the existence of a "clear sailing" arrangement, which provides "for the payment of attorneys' fees separate and apart from class funds," or a provision under which defendant agrees not to object to the attorney's fees sought; and (iii) "when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund."  *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011) (internal quotations and citations omitted).  "The presence of these three signs is not a death knell— but when they exist, 'they require[] the district court to examine them, . . . develop the record to support its final approval decision,' and thereby 'assure itself that the fees awarded in the agreement were not unreasonably high.'"  *Kim v. Allison*, 8 F.4th 1170, 1180 (9th Cir. 2021) (quoting *Allen v. Bedolla*, 787 F.3d 1218, 1224 (9th Cir. 2015)).  Thus, while this Court has wide latitude to determine whether a settlement is substantively fair, it is held to a higher procedural standard, and in order "[t]o survive appellate review . . . [it] must show it has explored comprehensively all factors and must give a reasoned response to all non-frivolous objections."  *McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 606 (9th Cir. 2021) (quoting *Allen*, 787 F.3d at 1223-24).

     1.   Strength of Plaintiff's Case

When assessing the strength of a plaintiff's case, the court does not reach "any ultimate conclusions regarding the contested issues of fact and law that underlie the merits of th[e] litigation."  *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379, 1388 (D. Ariz. 1989).  The court cannot reach such a conclusion because evidence has not been fully presented. *Id.*  Instead, the court "evaluate[s] objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach these agreements."  *Id.*

While Plaintiffs are "confident in their position, they acknowledge that there are certain weaknesses in their legal claims." (Doc. 149 at 18).  A central issue in this case is whether the time Walmart employees spent waiting in line to undergo Covid-19 screenings before clocking in for work is compensable under California law.  Plaintiffs note that the case *Frlekin v. Apple, Inc.*, 8 Cal.5th 1038,1043-44 (2020) demonstrates the strength of their legal claim.  In that case, Apple employees were required to submit to an exit search after clocking out from their shifts.  *Frlekin*, 8 Cal.5th at 1044.  The California Supreme Court found that the employees were entitled to compensation for the time spent undergoing the search, as they were "clearly under Apple's control while awaiting, and during, the exit searches."  *Frenklin*, 8 Cal. 5th at 1047.  Thus, Plaintiff analogizes, California law supports their legal claim that the time spent by Walmart employees undergoing the screenings is compensable.  Plaintiff acknowledges, however, that Walmart's defenses may have merit.  First, Walmart contends the time spent undergoing the screenings was negligible, at best, and Walmart automatically paid each employee five minutes per shift for the time spent undergoing the screenings.  Walmart also contends it had a policy to pay any employee who reported taking longer than five minutes to complete the screenings.  These defenses may be a complete bar to Plaintiff's claims.  (Doc. 149 at 21).

The parties also dispute whether the time spent between the screening and clocking in is compensable under California law.  Plaintiffs maintain this time is compensable based on the "continuous workday rule." (Doc. 149 at 22).  Under this rule, promulgated in *IBP, Inc. v. Alvarez*, 546 U.S. 21, 37 (2005), "any [waiting] time that occurs after the beginning of the employee's first principal activity and before the end of the employee's last principal activity . . . is covered by the FLSA."  Plaintiffs contend the screenings are their "first principal activity," and therefore, any time after the screenings is compensable.  Defendant counters that this time is not compensable because Plaintiffs were free to engage in personal activities during this time, and any time spent walking to the time clocks was minimal.

The parties also "heavily dispute" the amount of time it took Class Members to undertake the screenings.  Defendant's expert Robert Crandall estimates Class Members spent 29.1 seconds waiting in line and undergoing the screenings. (*See* Doc. 149 at 23).  He also estimates employees

spent 4.52 minutes walking to the time clocks, and the total amount of time (on average) spent undergoing the screenings is 5.01 minutes.  Plaintiff's model estimates the average screening took 0.94 minutes, and the average "walking time" was 4.52 minutes.  Plaintiffs estimate "a conservative range of time spent off-the-clock as a result of the COVID screenings is between 5.18 minutes and 6.22 minutes."  Defendant previously paid Class Members for an additional five minutes of work per shift to account for the screenings.  Plaintiffs admit that the parties have continued to "heavily dispute" these facts.

Considering the strengths and weaknesses of Plaintiff's case, the Court finds that consideration of this factor weighs in favor of granting final approval of the parties' settlement in this action.

2. <u>Risk, Expense, Complexity, and Likely Duration of Further Litigation, and Risk of Maintaining Class Action Status Throughout Trial</u>

The second and third *Churchill* factors, the risk, expense, complexity, and likely duration of further litigation, and the risk of maintaining class action status throughout trial, weigh in favor of approval.  *See* Fed. R. Civ. P. 23(e)(2)(C)(i).  "[T]here is a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned."  *In re Syncor ERISA Litig.*, 516 F.3d at 1101 (citing *Class Plaintiffs*, 955 F.2d at 1276).  As a result, "[a]pproval of settlement is preferable to lengthy and expensive litigation with uncertain results."  *Johnson v. Shaffer*, No. 2:12-cv-1059-KJM-AC, 2016 WL 3027744, at *4 (E.D. Cal. May 27, 2016) (citing *Morales v. Stevco, Inc.*, No. 1:09-cv-00704-AWI-JLT, 2011 WL 5511767, at *10 (E.D. Cal. Nov. 10, 2011)).

Because of the above-described risks, Plaintiff contends that additional litigation would increase risk and delay.  (Doc. 149 at 23-24).  As previously noted, Plaintiff is not guaranteed that the time Walmart employees spent undergoing the Covid-19 screenings is compensable.  Further, to recover, Plaintiffs would have to incur additional expenses to conduct further discovery, to bring/defend dispositive motions, and to go to trial.  Plaintiffs also note that regardless of the judgment, litigation would likely continue through the appeals process, which could take years and leave Plaintiffs with no recovery at all.  Plaintiffs also note that Defendant heavily contests class

1   certification, and Plaintiff faces significant risk their claims would not ultimately be certified.

2   Accordingly, the Court finds that consideration of this factor weighs in favor of granting final

3   approval.

4         3.    <u>Amount Offered in Settlement</u>

5         To evaluate the fairness of the settlement award, the court should "compare the terms of the

6   compromise with the likely rewards of litigation." *Protective Comm. for Indep. Stockholders of*

7   *TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968); *see also* Fed. R. Civ. P.

8   23(e)(2)(C)-(D). "It is well-settled law that a cash settlement amounting to only a fraction of the

9   potential recovery does not *per se* render the settlement inadequate or unfair." *In re Mego Fin.*

10  *Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000). To determine whether a settlement "falls

11  within the range of possible approval," a court must focus on "substantive fairness and adequacy"

12  and "consider plaintiffs' expected recovery balanced against the value of the settlement offer." *In*

13  *re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007). In addition, the court

14  must consider whether "the proposal treats class members equitably relative to each other" and

15  whether "the relief provided for the class is adequate." Fed. R. Civ. P. 23(e)(2)(C)-(D).

16            *a.*    *Gross settlement amount*

17        Here, the parties have agreed to a $5,200,000 GSA, allocated to Class Members after the

18  following expenses are deducted from the GSA: (1) $37,500 in civil PAGA penalties payable to

19  the to the California Labor and Workforce Development Agency ("LWDA") [4]; (2) $20,000 in

20  incentive payments to be split between the two named plaintiffs; (3) $432,522 in costs to be paid

21  to Rust for administering the settlement; (4) $1,733,160 of attorneys' fees and (5) $261,751.87 in

22  litigation expenses. (Doc. 149-1 at 37).

23        The NSA ($2,715,066.13) divided by the approximate number of Class Members who have

24  not opted out (221,374) brings the average settlement amount to $12.26. Plaintiffs estimate "a

25  conservative range of time spent off-the-clock as a result of the COVID screenings is between 5.18

26  minutes and 6.22 minutes" per screening. Defendant has already paid its employees for an

---

[4] The settlement has set aside $50,000 to be allocated to PAGA relief. Pursuant to the PAGA, 75% of the civil PAGA penalties, or $37,500, will go to the LWDA, and 25%, or $12,500, will be allocated to the net settlement amount ("Net Settlement Amount" or "NSA"). (Doc. 149-1 at 14). *See* Cal. Lab. Code § 2699(i).

additional five minutes of work per shift.  (Doc. 149 at 11).  Plaintiffs estimate that the settlement would allow Class Members to recover approximately 98 percentage of the unpaid wages owed to Class Members.  (Doc. 149-2 at 8).  This settlement amount exceeds the range of the percentage recoveries that California district courts—including this court—have found to be reasonable.  *See, e.g., Singh v. Roadrunner Intermodal Servs., LLC*, No. 1:15-cv-01497-DAD-BAM, 2018 WL 2412325, at *7 (E.D. Cal. May 29, 2018), modified, No. 1:15-cv-01497-DAD-BAM, 2018 WL 4382202 (E.D. Cal. Sept. 13, 2018) (approving a settlement of about 12% of the estimated maximum damages); *Glass v. UBS Fin. Servs., Inc.*, No. 3:06-cv-04068-MMC, 2007 WL 221862, at *4 (N.D. Cal. Jan. 26, 2007) (approving a settlement of about 25–35% of the estimated maximum).  In addition, the Court notes that the allocation formula employed here is fair and reasonable because each Settlement Class Member is allocated a payout that scales directly to the number of periods worked.  None of the settlement will revert to Defendant, as the settlement does not require Class Members to submit a claim.  Instead, the Class Members who did not opt out will be automatically paid accordingly.  (Doc. 149-1).  Any funds distributed to Class Members who do not cash their checks will be redistributed to Class Members who cashed their initial checks.  (Doc. 149-1 at 24).  Any funds remaining after the distribution process will be tendered to the California State Controller's Office as unclaimed property.  (Doc. 149-1 at 24).

As noted above, the Court has not received objections to the settlement, and only 19 Class Members (out of more than 200,000) have opted out of the settlement.  Finally, the Court acknowledges that while "a larger award was theoretically possible, 'the very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes'" (*See* Doc. 29 at 20 (quoting *Barbosa v. Cargill Meat Sols. Corp.*, 297 F.R.D. 431, 447 (E.D. Cal. 2013) (citing *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) (internal citations and quotation marks omitted)).)

Based on the information before the Court, the Court concludes that the amount offered in settlement of this action provides adequate relief for the class.

### b.  PAGA penalties

As described above, the settlement provides for $50,000 in civil PAGA penalties.  (Doc.

11

1    149-1 at 14).  Pursuant to the PAGA, 75% of the civil penalties, or $37,500, will go to the LWDA,

2    and 25%, or $12,500, will remain in the Net Settlement Amount.[5]  (*Id.*)  *See* Cal. Lab. Code §

3    2699(i).

4           Although there is no binding authority setting forth the proper standard of review for PAGA

5    settlements, California district courts "have applied a Rule 23-like standard, asking whether the

6    settlement of the PAGA claims is fundamentally fair, adequate, and reasonable in light of PAGA's

7    policies and purposes."  *Haralson*, 383 F. Supp. 3d at 972 (internal quotation marks omitted).  This

8    standard is derived principally from the LWDA itself.  In commenting on a proposed settlement

9    including both class action and PAGA claims, the LWDA offered the following guidance:

> It is thus important that when a PAGA claim is settled, the relief provided for under
> the PAGA be genuine and meaningful, consistent with the underlying purpose of
> the statute to benefit the public and, in the context of a class action, the court
> evaluate whether the settlement meets the standards of being "fundamentally fair,
> reasonable, and adequate" with reference to the public policies underlying the
> PAGA.

14   *O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1133 (N.D. Cal. 2016) (citing the LWDA's

15   guidance with approval).[6]  Recognizing the distinct issues presented by class actions, this Court is

16   persuaded by the LWDA's reasoning in *O'Connor* and therefore adopts its proposed standard in

17   evaluating the PAGA portion of the settlement now before the court.  *See, e.g., Castro v. Paragon*

18   *Indus., Inc.*, No. 1:19-cv-00755-DAD-SKO, 2020 WL 1984240, at *6 (E.D. Cal. Apr. 27, 2020);

19   *Patel v. Nike Retail Servs., Inc.*, No. 14-cv-04781-RS, 2019 WL 2029061, at *2 (N.D. Cal. May 8,

20   2019).  Accordingly, the Court will approve a settlement of PAGA claims upon a showing that the

21   settlement terms (1) meet the statutory requirements set forth by the PAGA; and (2) are

22   fundamentally fair, reasonable, and adequate in view of the PAGA's public policy goals.

23          When a proposed settlement involves overlapping class action and PAGA claims, courts

24   may employ a "sliding scale" in determining if the proposed settlement is "fundamentally fair,

---

[5] Under the PAGA, an "aggrieved employee" may bring an action for civil penalties for labor code violations on behalf of herself and other current or former employees.  Cal. Lab. Code § 2699(a).  An "aggrieved employee" is defined as "any person who was employed by the alleged violator and against whom one or more of the alleged violations was committed."  *Id.* § 2699(c).

[6] The LWDA has also stated that it "is not aware of any existing case law establishing a specific benchmark for PAGA settlements, either on their own terms or in relation to the recovery on other claims in the action."  *O'Connor v. Uber Techs., Inc.*, No. 3:13-cv-03826-EMC (N.D. Cal. Jul. 29, 2016) (Doc. 736 at 2–3).

reasonable, and adequate with reference to the public policies underlying the PAGA." *O'Connor*, 201 F. Supp. 3d at 1134; *see also Haralson*, 383 F. Supp. 3d at 972 (following *O'Connor*); *McClure v. Brand Energy Serv.*, LLC, No. 2:18-cv-01726-KJM-AC, 2021 WL 2168149, at *10 (E.D. Cal. May 27, 2021) (same); *Cooks v. TNG GP*, No. 2:16-cv-01160-KJM-AC, 2020 WL 5535397, at *9–10 (E.D. Cal. Sept. 15, 2020) (same).  As the district court in *O'Conno*r explained:

> For example, if the settlement for the Rule 23 class is robust, the purposes of PAGA may be concurrently fulfilled. By providing fair compensation to the class members as employees and substantial monetary relief, a settlement not only vindicates the rights of the class members as employees, but may have a deterrent effect upon the defendant employer and other employers, an objective of PAGA. Likewise, if the settlement resolves the important question of the status of workers as employees entitled to the protection of the Labor Code or contained substantial injunctive relief, this would support PAGA's interest in "augmenting the state's enforcement capabilities, encouraging compliance with Labor Code provisions, and deterring noncompliance."

*Id*. at 1134–1135 (quoting the LWDA's guidance).  At the same time, where "the compensation to the class amounts is relatively modest when compared to the verdict value, the non-monetary relief is of limited benefit to the class, and the settlement does nothing to clarify [aggrieved workers' rights and obligations], the settlement of the non-PAGA claims does not substantially vindicate PAGA." *Id*. at 1135.  Finally, "where plaintiffs bring a PAGA representative claim, they take on a special responsibility to their fellow aggrieved workers who are effectively bound by any judgment." *Id*. at 1134.  Plaintiff's special responsibility to other aggrieved workers is especially significant because the "PAGA does not require class action procedures, such as notice and opt-out rights." *Id*. Thus,

> [t]he Court must be cognizant of the risk that despite this responsibility, there may be a temptation to include a PAGA claim in a lawsuit to be used merely as a bargaining chip, wherein the rights of individuals who may not even be members of the class and the public may be waived for little additional consideration in order to induce the employer to agree to a settlement with the class.

*Id*.

The $50,000 civil penalty proposed by the settlement represents approximately 9.6% of the $5,200,000 GSA.  The amount proposed to settle the PAGA claims is consistent with, and in fact

exceeds, other PAGA settlements approved by this court.  *See, e.g., Syed v. M-I, LLC*, No. 1:12-cv-01718-DAD-MJS, 2017 WL 714367, at *13 (E.D. Cal. Feb. 22, 2017) (approving PAGA penalties representing 1.4% of the gross settlement fund); *Garcia v. Gordon Trucking, Inc.*, No. 1:10-cv-0324-AWI-SKO, 2012 WL 5364575, at *7 (E.D. Cal. Oct. 31, 2012) (approving PAGA penalties representing 0.27% of the gross settlement fund); *Castro*, 2020 WL 1984240, at *15 (approving PAGA penalties representing 2% of the gross settlement fund).

Plaintiffs submitted the settlement for review by the LWDA on October 9, 2024.[7]  (*See* Doc. 155.)  As of January 7, 2025, the LWDA has not commented or indicated any objection to the settlement.  (*Id.*)  Having reviewed the parties' submission and the terms of the proposed settlement, the Court finds that the settlement amount related to Plaintiff's PAGA claims is fair, reasonable, and adequate considering the PAGA's public policy goals, and therefore, the amount offered in settlement of the PAGA claims weighs in favor of final approval of the settlement.

### 4.   Extent of Discovery Completed and Stage of the Proceedings

"In the context of class action settlements, 'formal discovery is not a necessary ticket to the bargaining table' where the parties have sufficient information to make an informed decision about settlement."  *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998) (quoting *In re Chicken Antitrust Litig.*, 669 F.2d 228, 241 (5th Cir. 1982)).  Approval of a class action settlement "is proper as long as discovery allowed the parties to form a clear view of the strengths and weaknesses of their cases."  *Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D. 443, 454 (E.D. Cal. 2013).  A settlement is presumed fair if it "follow[s] sufficient discovery and genuine arms-length negotiation."  *Adoma v. Univ. of Phx., Inc.*, 913 F. Supp. 2d 964, 977 (E.D. Cal. 2012) (quoting *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004)).  The court must consider whether the process by which the parties arrived at their settlement is truly the product of arm's length bargaining and not collusion or fraud.  *Millan v. Cascade Water Servs., Inc.*, 310 F.R.D. 593, 613 (E.D. Cal. 2015).  These concerns are also reflected in Rule 23(e)(2)'s

---

[7] Although the PAGA requires that the proposed settlement be submitted to the LWDA at the same time that it is submitted to the court, *see* Cal. Lab. Code § 2699(l)(2), the Court finds that that the late notice does not defeat the settlement because the requirement "does not appear to be jurisdictional" and the LWDA had "ample opportunity to voice its views before final approval."  *Urena v. Cent. California Almond Growers Assn.*, No. 1:18-cv-00517-NONE-EPG, 2020 WL 3483280, at *12 (E.D. Cal. June 26, 2020).

focus on procedural fairness—whether "the class representatives and class counsel have adequately represented the class" and whether "the proposal was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(A)-(B).

As detailed in the Court's order granting preliminary approval, the Court is satisfied that the settlement was the result of "genuine, informed, and arm's-length bargaining." (Doc. 135 at 18). The parties engaged in a private mediation Antonio Piazza, a mediator, on September 11, 2023, after engaging in significant discovery and motion practice. (Doc. 149 at 14). Based on the parties' discovery, the parties engaged in "rigorous" negotiations, where Mr. Piazza played an active role in settlement negotiations. (*Id.*). Mr. Piazza received briefs, dozens of exhibits (including statistical modeling and deposition excerpts), and he discussed the case with both parties and their counsel. This process culminated in Mr. Piazza making a neutral and informed mediator's proposal, which both sides accepted. Accordingly, the Court concludes that consideration of this factor weighs in favor of granting final approval.

5.    Experience and Views of Counsel

Class Counsel Don Foty submitted a declaration describing his experience in class and representative action litigation. (Doc. 149-2). Mr. Foty graduated from the University of Houston Law Center in 2003. (*Id.* at 2). He is admitted to practice in several federal courts, and for the last fifteen years, he has regularly litigated wage and hour disputes. (*Id.* at 2). He has served as class counsel in approximately 100 wage and hour class and collective actions. (Doc. 149-2 at 2). In his declaration, Mr. Foty represents that he believes the settlement if fair and reasonable, as the parties have continued to heavily dispute the amount of time Class Members spent waiting in line and completing Covid-19 screenings. (*Id.* at 7). He highlights that the settlement provides for a recovery of nearly 98 percent of the unpaid wages Plaintiffs allege they are owed, and the settlement allows the Class Members to keep the additional pay Walmart previous provided. (*Id.*). The Court finds that class counsel's experience and views weigh in favor of granting final approval.

6.    Presence of a Governmental Participant

The Settlement Agreement contemplates payment of a total of $50,000 in civil PAGA penalties, $35,000 of which is payable to the LWDA. (Doc. 149-1 at 14). Because LWDA is a

1  governmental participant in the settlement, this weighs in favor of approval of the settlement.  *See*

2  *Adoma*, 913 F. Supp. 2d at 977 (factoring civil PAGA penalties in favor of settlement approval);

3  *Zamora v. Ryder Integrated Logistics, Inc.*, No. 3:13-cv-02679-CAB-BGS, 2014 WL 9872803, at

4  *10 (S.D. Cal. Dec. 23, 2014) (same).

5         7.      Reaction of the Class Members

6        "It is established that the absence of a large number of objections to a proposed class action

7  settlement raises a strong presumption that the terms of a proposed class settlement action are

8  favorable to the class members."  *Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 529 (citing cases).

9  The presumption that a settlement is fair, reasonable, and adequate is particularly strong when there

10  is an absence of a single objection to a proposed class action settlement.  *See id.*; *Barcia v. Contain-*

11  *A-Way, Inc.*, No. 3:07-cv-00938-IEG-JMA, 2009 WL 587844, at *4 (S.D. Cal. Mar. 6, 2009).

12  Nevertheless, "[a] court may appropriately infer that a class action settlement is fair, adequate, and

13  reasonable when few class members object to it."  *Cruz v. Sky Chefs, Inc.*, No. 4:12-cv-02705-

14  DMR, 2014 WL 7247065, at *5 (N.D. Cal. Dec. 19, 2014) (citing *Churchill Vill.*, 361 F.3d at 577).

15        No Class Members have filed an objection to the settlement pending final approval, and

16  only 19 out of more than 200,000 Class Members have opted out of the settlement.  (Doc. 149-1 at

17  38-39).  Accordingly, consideration of this factor weighs in favor of granting final approval.

18         8.      Subtle Signs of Collusion

19        The Court now turns to the *Bluetooth* factors to examine whether any "more subtle signs"

20  of collusion recognized by the Ninth Circuit are present here.  *See Bluetooth*, 654 F.3d at 947.

21          *a.*      *Whether there is disproportionate distribution to counsel*

22        The Court finds that Class Counsel is not seeking a disproportionate distribution of the

23  settlement.  Counsel is seeking one-third of the GSA in attorney's fees.  While on the higher end

24  of the spectrum, this is in line with what the Ninth Circuit has found to be appropriate in class action

25  suits.  *See, e.g.*, *Morales*, 2011 WL 5511767, at *12 ("The typical range of acceptable attorneys'

26  fees in the Ninth Circuit is 20% to 33 1/3% of the total settlement value, with 25% considered the

27  benchmark.") (quoting *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000)); *Castro*, 2021 WL

28  20242333, at *5, *12 (E.D. Cal. May 21, 2021) (granting final approval of a class action settlement

1    with an average individual class member recovery of $1,070.62 and an award of $1,031,250.00 in

2    attorney's fees).[8]

3                    *b.      Existence of a "clear sailing" agreement*

4          In general, a "clear sailing" provision is one in which the parties agree to the "payment of

5    attorneys' fees separate and apart from class funds." *Bluetooth*., 654 F.3d at 947.  However, the

6    Ninth Circuit has recognized that a "clear sailing" arrangement exists when a defendant expressly

7    agrees not to oppose an award of attorney's fees up to an agreed upon amount. *Lane*, 696 F.3d at

8    832; *Bluetooth*, 654 F.3d at 947.  There is no clear sailing arrangement as part of the parties'

9    settlement agreement.  (*See* Doc. 149-1.)

10                   *c.      Whether there is a reversion to the defendant*

11         Finally, the parties did not arrange for any unawarded fees to revert to Defendant.  Instead,

12   the GSA is "non-reversionary," and fees shall be paid from the GSA.  (Doc. 149-1 at 5.)  Because

13   any unawarded fees return to the Settlement Amount for distribution to the class, this factor does

14   not support a finding of collusion between the parties.

15         In light of the foregoing, the Court is satisfied that the more subtle signs of collusion noted

16   in *Bluetooth* are not present here and finds that the settlement is fair, reasonable, and adequate.  *See*

17   Fed. R. Civ. P. 23(e).  Therefore, the Court will grant Plaintiff's motion for final approval of the

18   parties' class action settlement.

19              **IV.      ATTORNEY'S FEES, COSTS, SERVICE AWARD,
20                              AND ADMINISTRATION EXPENSES**

21         Plaintiff has also submitted a motion seeking attorney's fees, class counsel's litigation

22   expenses, settlement administration expenses to Rush, and a service award for Plaintiffs.

23   **A.    Attorney's Fees**

24         This Court has an "independent obligation to ensure that the award [of attorney's fees], like

25   the settlement itself, is reasonable, even if the parties have already agreed to an amount." *Bluetooth*,

26   654 F.3d at 941.  This is because, when fees are to be paid from a common fund, the relationship

27   between the class members and class counsel "turns adversarial." *In re Mercury Interactive Corp.*

28   _____
[8] Class counsel's request for attorneys' fees is further discussed below.

1    *Secs. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010); *In re Wash. Pub. Power Supply Sys. Secs. Litig.*, 19

2    F.3d 1291, 1302 (9th Cir. 1994).  As such, the district court assumes a fiduciary role for the class

3    members in evaluating a request for an award of attorney's fees from the common fund.  *In re*

4    *Mercury*, 618 F.3d at 994; *see also Rodriguez v. Disner*, 688 F.3d 645, 655 (9th Cir. 2012); *West*

5    *Publ'g Corp.*, 563 F.3d at 968.

6           The Ninth Circuit has approved two methods for determining attorney's fees in cases where

7    the attorney's fee award is taken from the common fund set aside for the entire settlement: the

8    "percentage of the fund" method and the "lodestar" method.  *Vizcaino v. Microsoft Corp.*, 290 F.3d

9    1043, 1047 (9th Cir. 2002) (citation omitted).  The district court retains discretion in common fund

10   cases to choose either method.  *Id.*; *Vu v. Fashion Inst. of Design & Merch.*, No. 2:14-cv-08822-

11   SJO-EX, 2016 WL 6211308, at *5 (C.D. Cal. Mar. 22, 2016).    Under either approach,

12   "[r]easonableness is the goal, and mechanical or formulaic application of method, where it yields

13   an unreasonable result, can be an abuse of discretion."  *Fischel v. Equitable Life Assurance Soc'y*

14   *of U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002).  As noted above, the Ninth Circuit has generally set a

15   25% benchmark for the award of attorney's fees in common fund cases.  *Id.* at 1047-48; *see also*

16   *Bluetooth*, 654 F.3d at 942 ("[C]ourts typically calculate 25% of the fund as the 'benchmark' for a

17   reasonable fee award, providing adequate explanation in the record of any 'special circumstances'

18   justifying a departure.").

19          Reasons to vary from the benchmark award may be found when counsel achieves

20   exceptional results for the class, undertakes "extremely risky" litigation, generates benefits for the

21   class beyond simply the cash settlement fund, or handles the case on a contingency basis.  *Vizcaino*,

22   290 F.3d at 1048-50; *see also In re Online DVD-Rental*, 779 F.3d at 954–55.  Ultimately, however,

23   "[s]election of the benchmark or any other rate must be supported by findings that take into account

24   all of the circumstances of the case."  *Vizcaino*, 290 F.3d at 1048.  The Ninth Circuit has approved

25   the use of the lodestar cross-check as a way of determining the reasonableness of a particular

26   percentage recovery of a common fund.  *Id.* at 1050 ("Where such investment is minimal, as in the

27   case of an early settlement, the lodestar calculation may convince a court that a lower percentage

28   is reasonable. Similarly, the lodestar calculation can be helpful in suggesting a higher percentage

1   when litigation has been protracted."); *see also In re Online DVD-Rental*, 779 F.3d at 955.

2          Here, the Settlement Agreement provides that Class Counsel will seek an award of 33.33%

3   of the GSA, equivalent to $1,733,160.  (Doc. 143).  When the Court approved the preliminary

4   settlement, it noted that an award for 33.33% of the GSA was at the higher end of what the Ninth

5   Circuit has deemed appropriate.  (Doc. 135 at 23) (citing *Barbosa v. Cargill Meat Sols. Corp.*, 297

6   F.R.D. 431, 448 (E.D. Cal. 2013) ("The typical range of acceptable attorneys' fees in the Ninth

7   Circuit is 20 percent to 33.3 percent of the total settlement value, with 25 percent considered a

8   benchmark percentage.").

9          Upon final review, the Court finds that a fee award of 33.33% of the GSA is reasonable for

10  several reasons.  First, the results obtained by class counsel in this case, which allows the Class

11  Members to recover 98 percent of their allegedly owed wages, weighs in favor of approval.

12  Working on a contingent fee basis and undertaking the financial burdens of prosecuting the action

13  supports that the reasonableness of the requested attorney's fees.  *See id.* (considering, in approving

14  fee award, the "considerable financial burdens that Class Counsel shouldered on a contingent

15  basis.").  For instance, class counsel has spent more than 1,600 hours working on this case thus far

16  without compensation.  The Ninth Circuit has recognized that counsel retained on a contingency

17  fee basis is entitled to a premium above their hourly rate to compensate for both the risks and the

18  delay in payment.  *See Stanger v. China Elec. Motor, Inc.*, 812 F.3d 734 (9th Cir. 2016); *Stetson v.*

19  *Grissom*, 821 F.3d 1157, 1166 (9th Cir. 2016).  The Court also notes that no Class Members

20  objected to the settlement, and only 19 members sought to be excluded despite specific notice to

21  the class regarding the amount of attorney's fees counsel sought.  As Plaintiffs note, there were

22  several risks associated with further litigation; Defendant had moved for summary judgment,

23  contested class certification under Rule 23, and moved to strike Plaintiffs' expert who provided the

24  statistical analysis regarding the amount of time Class Members spent off the clock for Covid-19

25  screenings.  (Doc. 90).

26          An award of 33.33% is also in line with what other Courts have awarded in similar

27  situations.  *See, e.g., Vandervort v. Balboa Capital Corp.*, 8 F. Supp. 3d 1200, 1209–10 (C.D. Ca.

28  2014) (approving 33% fee award from common fund settlement); *Thieriot v. Celtic Ins. Co.*, No. C

10-04462 LB, 2011 WL 1522385, at *6 (N.D. Cal. Apr. 21, 2011) (approving 33% fee award where class counsel took the case on a contingency basis and "obtained quality results").  "In 'megafund' cases, fees will commonly be under the [25%] benchmark, while in smaller cases—particularly where the common fund is under $10 million—awards more frequently exceed the benchmark." *Vandervort,* 8 F.Supp.3d at 1209 (citing *Lopez v. Youngblood*, No. CV–F–07–0474 DLB, 2011 WL 10483569, *13 (E.D. Cal. Sept. 2, 2011)).  Although this percentage is higher than the 25% benchmark, it is consistent with other wage and hour class actions where the recovery is less than $10 million.  *See Craft v. County of San Bernardino*, 624 F.Supp.2d 1113, 1127 (C.D. Cal. 2008) (noting that attorneys' fees for cases with a fund below $10 million are often more than the 25% benchmark); *Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482, 491-92 (E.D. Cal. 2010) (approving attorneys' fees for 33.3% of the common fund); *Singer v. Becton Dickinson and Co.*, 2010 WL 2196104, * 8 (S.D. Ca. June 1, 2010) (approving attorneys' fees for 33.3% of the total recovery).  Accordingly, the Court finds the amount reasonable under the percentage of the fund method.

The Court next turns to the lodestar method to cross-check the reasonableness of the requested attorney's fee award.  Where a lodestar is merely being used as a cross-check, the court "may use a 'rough calculation of the lodestar.'"  *Bond v. Ferguson Enters., Inc.*, No. 1:09-cv-1662-OWW-MJS, 2011 WL 2648879, at *12 (E.D. Cal. June 30, 2011) (quoting *Fernandez v. Victoria Secret Stores, LLC*, No. 2:06-cv-04149-MMM-SHX, 2008 WL 8150856 (C.D. Cal. July 21, 2008)).  To calculate the lodestar amount, the Court multiplies the number of hours expended on litigation by a reasonable hourly rate.  *Bond v. Ferguson Enterprises, Inc.*, 1:09–cv–1662 OWW MJS, 2011 WL 2648879, at *11 (E.D. Cal. June 30, 2011) (citing *Cunningham v. County of Los Angeles*, 879 F.2d 481 (9th Cir. 1988)).  The product of this computation, the "lodestar" amount, yields a presumptively reasonable fee. *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013).

The lodestar cross-check supports the requested award of $1,733,160 in attorneys' fees.  Class Counsel expended 1,680 hours on this litigation, not accounting for any time spent on the case after Plaintiffs submitted the Motion for Attorneys Fees (which includes preparing the Motion for Final Approval and overseeing administration of the settlement).  Based on the reasonable

20

hourly rates used by the Court in *Boone v. Amazon.com Services*, LLC, 1:21-CV-241-KES-BAM (E.D. Cal. May 22, 2024) (Dkt. 105), the lodestar total is $458,240.  To reach the total fees requested ($1,733,160) would require a multiplier of 3.78.

First, some of the hourly rates used in *Boone* were on the lower end of what has been accepted elsewhere in the district.  For instance, in *Boone*, the Court allotted for a rate of $325 per hour for Mr. Foty, who has been in practice since 2006.  Other courts have found higher rates to be fair and reasonable for someone with Mr. Foty's experience.  *See Mathien v. Pier 1 Imports (U.S.), Inc.*, No: 1:16-cv-00087-DAD-SAB, 2018 WL 1993727, at *11 (E.D. Cal. Apr. 27, 2018) (accepting hourly rates of $675 and $750 for senior counsel and partners); *Emmons v. Quest Diagnostics Clinical Labs., Inc.*, 1:13-cv-00474-DAD-BAM, at *8 (E.D. Cal. Feb. 27, 2017) (accepting hourly rates between $500 and $720 for partners).  Even using these rates, the lodestar total requires a reasonable multiplier of 3.78 to reach the total attorneys' fees requested. "Multipliers in the 3–4 range are common in lodestar awards for lengthy and complex class action litigation."  *Van Vranken v. Atlantic Richfield Co.*, 901 F. Supp. 294, 298 (N.D. Cal. 1995) (citing *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 549 (S.D. Fla. 1988)).

The Court finds a 3.78 lodestar multiplier to be reasonable here for purposes of a cross-check.  Accordingly, the Court concludes that the lodestar cross-check supports the requested award of $1,733,160 in attorney's fees, an amount equal to one-third of the GSA in this case.

**B.     Costs and Expenses of Class Counsel**

Class Counsel also seeks to recover the costs and expenses advanced while prosecuting this litigation.  Such awards "should be limited to typical out-of-pocket expenses that are charged to a fee-paying client and should be reasonable and necessary."  *In re Immune Response Secs. Litig.*, 497 F. Supp. 2d 1166, 1177 (S.D. Cal. 2007).  These can include reimbursements for: "(1) meals, hotels, and transportation; (2) photocopies; (3) postage, telephone, and fax; (4) filing fees; (5) messenger and overnight delivery; (6) online legal research; (7) class action notices; (8) experts, consultants, and investigators; and (9) mediation fees."  *Id.*

Here, Class Counsel requests reimbursement for $261,751.87 of charges.  (Doc. 143 at 27). These costs include: (1) $47,168.19 in deposition charges, (2) $168,110.59 for expert testimony,

(3) $20,000 for mediation fees, (4) $5,969.30 for flights, (5) $7,586.06 for conference rooms for depositions and hotel rooms; (6) $824.96 in meals, (7) $6,468.03 for filing charges and charges for service of summons and subpoenas, (8) $2,424.94 for copies/prints/FedEx charges, (9) $1,699.12 in parking and transportation; and (9) $1,500.68 in "miscellaneous" costs.  (Doc. 143 at 27).

Of note is the $168,110.59 Class Counsel expended on expert testimony.  Expert testimony, however, is the type of expense considered to be "a reasonable and necessary" expense charged to a fee-paying client, and the "appropriate analysis is whether the particular costs are of the type typically billed by attorneys to paying clients in the marketplace."  *See, e.g.*, *In re Stable Road Acquisition Corp.*, Case No. 2:21-CV-5744-JFW(SHKx), 2024 WL 3643393, at *15 (C.D. Cal. April 23, 2014) ("The vast majority of expenses ($98,336.35, or approximately 97.25%) were for the retention of a experts ($41,261.00), the mediator ($33,618.75), and a private investigation firm ($10,564.20), as well as online research ($12,892.40).

These expenses, like the other categories of expenses for which counsel seek reimbursement, are the types of expenses routinely charged to clients who pay hourly.  Accordingly, the Court has reviewed class counsel's declaration and finds all the charges incurred to be reasonable, and the Court will approve the reimbursement of costs and expenses in the amount of $261,751.87.

## C.    Service Award

Courts frequently approve "service" or "incentive" awards in class action cases.  *West Publ'g Corp.*, 563 F.3d at 958-59.  Service awards recognize the effort of class representatives "for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general."  *Id.* at 958.  The district court evaluates each award individually, using "relevant factors includ[ing] the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, . . . the amount of time and effort the plaintiff expended in pursuing the litigation . . . and reasonabl[e] fear[s of] workplace retaliation."  *Staton*, 327 F.3d at 977 (quoting *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998)).

Courts typically find an award of $5,000 to be presumptively reasonable.  *See, e.g.*, *In re*

*Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 457, 463 (9th Cir. 2000) (endorsing $5,000 service awards to named representatives); *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 246 (N.D. Cal. 2015) (collecting cases); *In re Toys R. Us-Del., Inc. FACTA Litig.*, 295 F.R.D. 438, 470-72 (C.D. Cal. 2014) (awarding plaintiffs $5,000 each "consistent with the amount courts typically award as incentive payments"). Higher amounts can be appropriate, such as in employment actions, where a plaintiff risks retaliation or blacklisting as a result of suing her employer. *See, e.g.*, *Buccellato v. AT&T Operations, Inc.*, No. 5:10-cv-00463-LHK, 2011 WL 4526673, at *4 (N.D. Cal. June 30, 2011).

Plaintiffs each seek a service award of $10,000 for their services in this action. Plaintiffs contend this amount is fair and reasonable compensation because they each expended between 70 and 75 hours toward the prosecution of this case. (Docs. 143-2, 3). Their efforts included "providing information about their work experience to Plaintiffs' Counsel, (2) discussing the complaint with Plaintiffs' Counsel and the claims that were alleged; (3) responding to requests for production issued by Walmart; (4) answering interrogatories issued by Walmart; (5) reviewing their pay and work records; (6) appearing for a deposition; (7) providing statements of factual details to Plaintiffs' Counsel; (8) engaging in discussions with Plaintiffs' Counsel during the initial investigation and after the case was filed; (9) consulting with Plaintiffs' Counsel regarding the status of the case during the lawsuit; (10) discussing mediation with Plaintiffs' Counsel and potential resolution of this action, and (11) reviewing the settlement agreement with Plaintiffs' Counsel." (*Id.*.). Plaintiffs' awards will each amount to approximately 0.19% of the GSA. Plaintiffs also contend the awards are appropriate, as they have signed a general employment release, and they have incurred substantial risk by filing this lawsuit, including the risk of damage to their reputations, as Defendant is "one of the largest and richest corporations in the county with substantial resources." (Doc. 143 at 11).

Although the service award sought is much higher than other Class Members could expect to receive from the proposed settlement, the Court finds the service award is appropriate in this instance. First, it is less than or equal to the amount awarded in similar circumstances. *See, e.g.*, *Castro*, 2021 WL 2042333, at *13 (granting $10,000 award for 70 hours of work over three years,

reflecting 0.025% of the gross settlement amount); *Acosta v. Evergreen Moneysource Mortg. Co.*, No. 2:17-cv-00466-KJM-DB, 2019 WL 6051117, at *18 (E.D. Cal. Nov. 15, 2019) (granting $10,000 award for 40 hours of work, reflecting 2.85% of the gross settlement amount); *Aguilar v. Wawona Frozen Foods*, No. 1:15-cv-00093-DAD-EPG, 2017 WL 2214936, at *8 (E.D. Cal. May 19, 2017) (approving a service award of $7,500 to each class representative where average class recovery was approximately $500). Plaintiffs also undertook a significant reputational risk by participating in this suit. *Martinez v. Knight Transportation, Inc.*, No. 1:16-cv-01730-SKO, 2023 WL 2655541, at 12 (E.D. Cal. March 27, 2023) ("Such incentive awards are particularly appropriate in wage-and-hour actions where a plaintiff undertakes a significant reputational risk in suing their employer.").

Considering Plaintiff's supporting declaration detailing their assistance with this case, the Court finds that the requested service payment of $10,000 to each named Plaintiff is fair and reasonable. Accordingly, the Court will award the service payment as requested.

### D.   Settlement Administration Expenses

The Court previously approved the appointment of Rust as the settlement administrator for this action. (Doc. 135 at 24). According to the declaration of Sara Schwermer-Sween, the settlement administrator, the total cost for administration of this settlement, including fees incurred and future costs for completion, is $432,522.00. (Doc. 149-3 at 3). No objections have been made to these expenses. While this amount is higher than what is typically administered[9] it is not higher than the amount agreed to in the settlement agreement (Doc. 149-1 at 14-15), and it is appropriate considering the sheer number of class notices sent in this case. *See Harris v. Vector Marketing Corp*, 2012 WL 381202, at *6 (N.D. Cal. Feb. 6, 2012) (approving $250,000 in administration costs where administrator sent out 68,487 class notices); *compare with Vasquez v. Coast Valley Roofing*, 266 F.R.D. 482, 483–84 (E.D. Cal. 2010) (approving a $25,000 settlement administration fee

---

[9] *See, e.g.*, *Castro*, 2020 WL 1984240, at *19 (administration costs of $15,000 for a $3.75 million settlement); *Gonzalez v. CoreCivic of Tennessee, LLC*, No. 1:16-cv-01891-DAD-JLT, 2020 WL 1475991, at *14 (E.D. Cal. Mar. 26, 2020) (administration costs of $15,000 for a $3.2 million settlement); *Dakota Med., Inc. v. RehabCare Grp., Inc.*, No. 1:14-cv-02081-DAD-BAM, 2017 WL 1398816, at *5 (E.D. Cal. Apr. 19, 2017) (administration costs of $94,000 for a $25 million settlement); *Aguilar v. Wawona Frozen Foods*, No. 1:15-cv-00093-DAD-EPG, 2017 WL 117789, at *7 (E.D. Cal. Jan. 11, 2017) (administration costs of $45,000 for a $4.5 million settlement).

1    awarded in wage and hour case involving approximately 170 class members).   Because the

2    administration of the settlement involved more than 200,000 class members, the Court will award

3    $432,522.00 for settlement administration.

## V.      CONCLUSION AND ORDER

5    Based on the foregoing,

6    1.      The proposed class identified in the Settlement Agreement (Doc. 149-1) is certified

7           for settlement purposes;

8    2.      Plaintiff's motion for final approval of a class action settlement (Doc. 149) is

9           GRANTED, and the Court approves the settlement as fair, reasonable, and adequate;

10   3.      Named Plaintiffs Amado Haro and Rochelle Ortega are confirmed as class

11          representatives; Plaintiff's counsel Don Foty of Hodges & Foty, LLP is appointed

12          as counsel for the Class; and Rust Consulting, Inc.  is confirmed as the settlement

13          administrator;

14   4.      Plaintiff's motion for attorney's fees, costs, service award, and administrative

15          expenses (Doc. 143) is GRANTED;

16   5.      The Court awards the following sums:

17          a.      Class counsel shall receive $1,733,160 in attorney's fees and $261,751.87.

18                  in expenses.  Class counsel shall not seek or obtain any other compensation

19                  or reimbursement from Defendant, Plaintiffs, or Class Members;

20          b.      Plaintiffs shall receive $10,000 as a service award each;

21          c.      Rust   Consulting,   Inc.,   shall   receive   $432,522.00   for   settlement

22                  administration;

23          d.      The parties shall direct payment of 75 percent of the settlement allocated to

24                  the PAGA payment, or $37,500, to the California Labor and Workforce

25                  Development Agency as required by California law, and the remainder of

26                  the PAGA payment, or $12,500, shall be distributed per the Settlement

27                  Agreement;

28

6.      The parties are directed to effectuate all terms of the Settlement Agreement (Doc. 149) and any deadlines or procedures for distribution set forth therein;

7.      In light of the parties' consent to magistrate judge jurisdiction for the purposes of handling the present motion and the Court's order thereon, (Docs. 129–130), this action is dismissed with prejudice, with the Court specifically retaining jurisdiction over this action for the purpose of enforcing the parties' settlement agreement; and

8.      The Clerk of Court is directed to close this case.

IT IS SO ORDERED.

Dated:   **January 8, 2025**                     /s/ *Sheila K. Oberto*

                                                          UNITED STATES MAGISTRATE JUDGE

26